Council, will you please approach the podium, both sides, both sides. Good morning, your honors. I'm Alvin Becker. I appear here on behalf of the Epelants. There are three Epelants. I'm going to be arguing for all of the Epelants. Okay. Counsel, who are you? My name is Craig Manchek. I represent Ms. Triana. She is one of the Epelants. He's going to talk for you. Okay. How much time do you need? Including rebuttal, I'd like 15 minutes. Sure. Counsel? Good morning, your honors. Stan Kitzinger on behalf of the Erie Insurance Exchange. The Epelant, 15 minutes should be sufficient. Okay. Thank you. We have read your briefs. We've looked at the cases. Presumed that we have done all that. And then hit your strong points first. Okay. And if we have any questions about any other points, we'll be sure to ask. Thanks a lot. Let's proceed with the Epelants. Once again, good morning. I just asked if both sides keep their voices up. I'm a little impaired hearing-wise. And that microphone does nothing but record. So when the Wagners applied for and paid an enhanced premium to purchase underinsured motorist coverage at $300,000 per person and $300,000 per occurrence, knowing what the common and, frankly, the universal definition of split limits are, did they reasonably expect, based upon the statute, the gloss put on the underinsured motorist statute by the Illinois Supreme Court, and a simple reading of the Erie policy, that they would indeed be entitled to coverage of $300,000 per person or $300,000, not to exceed $300,000 per occurrence. As the facts here demonstrate, the named Epelants sustained serious bodily injury by the hands of an underinsured motorist, and they collected the full policy limits of that underinsured motorist of $100,000 each. So the circuit court, respectfully, perhaps, but spooked by the Oberland case, concluded that the most that would be recoverable, no matter the nature, extent, and duration of the claimant's injuries, could not exceed $100,000. That, of course, defies what the understanding and meaning of a split-level policy is, and it, frankly, defies what the common reading of the policy would be. Without belaboring the point of hypotheticals, assuming Mr. Wagner had also been in that vehicle, he wasn't. But assuming he had, and assuming that Mr. Wagner also sustained injuries, substantially the same as the other two occupants of that vehicle, according to the position of Erie and according to the judgment of the circuit court, they would recover zero. That can't be. It can't be just by reading the policy. It can't be based upon the gloss given to the fair reading of the underinsured motorist statute and the decisional law of the Illinois Supreme Court with respect to, what is it that this underinsured motorist magic provides to an injured policyholder? Well, I think nobody would dispute or argue the legal proposition that you are entitled to recover, subject to the policy limits, $300,000, but you might not get it from all concerned. So that if, in fact, we got $100,000, they're entitled to their offset because, one, the statute provides for it and the policy provides for it, but they're not entitled to a double offset. And that's what they're getting here, and they're ignoring the distinction between the coverage per person versus coverage per occurrence. What would be your best case to get around the $300,000 per accident limit? We understand, acknowledge, and agree that under no circumstances can Erie be liable for more than $300,000 worth of coverage. We have never taken the position, although my able opponent says we have, that we are entitled to recover more than $300,000. That would, of course, do violence to the plain, unambiguous definition of what the policy provides with respect to what the per occurrence limit provides. In fact, if you look at the policy, there's a separate definition with respect to if you've purchased split limits versus if you've purchased a single limit. You know, you don't have to be a grammarian to read and understand what that difference is. The difference is that no matter how many claimants there are, they're entitled not to pay more than $300,000 if you've purchased a single limit policy. We didn't purchase a single limit policy here since they acknowledged that we paid an enhanced premium. What is it that we got besides, respectfully, snake oil? We didn't buy snake oil, and I don't think they intended to sell us snake oil. But the result obtained here, based upon the circuit court's decision, is that we got puff. We got absolutely something that's unfathomable based upon my reading of the cases and my reading of the policy and the decision of law. Isn't there a contract they made and they said we'll take $300,000 maximum? They could have taken $800,000. Respectfully, it's the paradigm of the underinsured motorist statute, which dovetails with the excess uninsured motorist statute, kind of works this way. And excuse me for doing this. You automatically, unless you agree to take less, get excess uninsured motorist equal to your bodily injury coverage. Once having made that election, you then automatically get underinsured motorist equal to your excess uninsured motorist. There's no provision in the statute which requires an insurer to provide underinsured motorist greater than the amount of your bodily injury liability coverage. So I hope that answers your question. So we've also given you, because I think it makes sense to do so, a better understanding of this case, we've given you here in the white brief a grid with regard to the potential scenarios that could occur here. And I think it's reasonably understandable as to what would happen here in that circumstance. We've given you various different combinations, permutations, what would happen if this happened, if the damages were such and such. Now, and that appears at page 22 of the white brief. And we tell you what it is that would be payable, knowing, of course, that they could never be responsible for more than $300,000. We understand that. So if you put that to practical circumstance, practical circumstances being adjudication at an arbitration forum, remembering that is the forum for the determination of damages. If Ms. Wagner convinces an arbitrator that her damages are $400,000 and Mrs. Trianas convinces an arbitrator her damages are $100,000, she's already recovered $100,000, she would recover nothing under the underinsured motorist coverage. What we would recover is, since there's a $300,000 per person, we would get $300,000 minus the $100,000, leaving us with $200,000. Under the scenario as a result of the judgment of the circuit court, no matter what the nature, extent, and duration of the insured claimant's injuries or damages are, they could not recover more than $100,000 to be shared by them in some fashion. That can't be, is not the law, and was never the law. We need to talk a little bit about Oberland. Oberland is a case which the circuit court definitely relied on, and a fair reading of my able opponent's brief tells us that that is a principle case that they rely upon. So we know that in Oberland there were multiple issues before the court. A principle issue before the court was the question of stacking. Stacking is not involved in our case. Another issue before the court was probably 80 or 90 percent of the opinion is devoted to stacking and quote, unquote, the other insurance clause, remembering there were two insurance companies there. In a pronouncement, and there is a pronouncement, there's no reasoning, there's no citation, and it was a split-level policy. You know, English is my mother tongue, too. I read it. I'm not trying to pervert the language that a respected jurist used. It was a split-level policy, and without any analysis or any citation to authority, he said you're entitled to a $200,000 offset. Can't be it. Two bodily injury claimants. Does violence to the language. There's no citation of authority for that conclusion. It's a wrong decision if we haven't distinguished it as to what was before the court on that case, and you cannot stack up that case with the policy contract that was employed in this case by Erie and for which, as I say, the Wagners paid an enhanced premium for. Even if they had purchased a single limit policy, the decision of the circuit court still could not stand. It could not stand because their limit of liability here would still be $300,000, not per person but for the total occurrence, so that if each one was severely damaged, they would be liable for $300,000. And respectfully, the offsets would come from the damages, and that's exactly what the Illinois Supreme Court said in the Holguin case. These offsets are not to be done from coverage. They're to be done from damages for the purpose of preventing a double recovery. There never would have been a double recovery here, and I could conceive of no basis other than the circuit court felt that it was constrained to follow whatever the rule of decision was in Openland. It cannot be based on the statute. It cannot be based upon any other decisional law, and it surely cannot be based upon the contract of the parties. Counsel, by saying that Openland doesn't apply at all, I mean, it appears to me, just from reading up the case and the facts, that they seem to be pretty much factually on point. You say they are? I did not say that. What I said was that, you know, I read English, too, and a very respected judge said that they're entitled to an offset on a split-level policy of $200,000. It can't be. It's wrongly decided. There is no citation to authority when you read that portion of the opinion with respect to that conclusion. You cannot even tell from reading Justice Giganti's opinion that, in fact, any argument or discussion was made with respect that this is not a single-limit policy. It's a split-limit policy. It's never even brought up. The closest thing to it was an argument that was made that the financial responsibility laws require that there be a split-limit policy in every case, and Justice Giganti pointed out that that was an argument first made in the reply brief, and it was forfeited because it wasn't properly before the court it was waived. So that's the closest thing that comes to it. We have never said that that was not a holding of the case. We say it is a dicta holding of the case. It is absolutely unsupported by any authority of any kind, and one cannot look at the policy language in this case and say, how do you come to that conclusion? If you put open land aside and if you were writing on a clean slate, you could never come to the conclusion that was reached in the circuit court in this case. The next question is, since you can't and shouldn't put open land aside, you look at open land and say, did they come to the right result? And if they came to the right result, what's their basis for coming to that result? You cannot tell that from reading the decision. There is no citation. There is no argument as to why it is. It is, as lawyers sometimes complain, it's a judicial fiat. That's the ruling. Take it or leave it, that's the ruling. And that's how the opinion was written with regard to that third issue in the case. We tried to distinguish that the best that we could. I can't look anybody in the eye and say that's a difference between twiddle-dee-dum or twiddle-dee-dee. Open land says what open land says. You are not duty-bound to follow open land. If you agree with me, and I hope you do, you should quickly pass it aside and say, well, good judge, made a mistake on that point. And you cannot come to any conclusion other than, once again, if you go to the three victims, if Mr. Wagner had been in this car, Erie would have said we're off the hook. Can't be. Shouldn't be. Isn't. Let me ask you another question. And excuse my ignorance. If two people were in the car and it was uninsured voters, just completely uninsured, would they not get $150 apiece? No. Why? Because it's a split-level policy. Each one is entitled to get $300,000. I agree. However, it's not to exceed the per-occurrence limit. In that case, they would, in fact, divide up $300,000. That's $150,000. That's right. But that's not our case. Is that what they got here? No. No. No. They received $100,000 each. A possible scenario in this case would be that they would divide up another $200,000 so that they would be paying out, they would have received a total of $300,000 because they're supposed to be put in the same position that they would have been in had the tortfeasor been adequately insured, under the decisional laws defined as the liability coverage that you purchased. Okay. Questions? Questions? Okay. So the language in the policy seems to be quite clear to me in that it does say that there's a $300,000 limit per accident. Yes. However, somewhere in here, if you have split limits and you have single limits, this person paid more for a split limit but didn't get any more out of it than if they had had single limits. Exactly. Exactly. Now, just one more example. It is possible in the hypothetical that I used, and whether it's Ms. Wagner or Mrs. Triana wouldn't make any difference, if one of them sustained very severe injuries, so their damage was $500,000 and one sustained $100,000 worth of damage, we would be entitled to recover $300,000. One would get zero because of the $100,000 offset. We would get $300,000. That is a combination of what the policy says and what the Illinois Supreme Court has said in the Holcomb case. So what needs to occur here is a damage determination, not to put a limitation on what can be recovered at this stage, but I don't fault any court or the insurance company for asking the court to determine what is their maximum exposure here. And had they not done it, we would have done it. In fact, we filed a cross motion for summary judgment to know what the maximum exposure is in the case. If Your Honors have no further questions, I'll be glad to sit down and conclude with the fact that it's not often that we are privileged to come before the First District for our argument. Thank you for inviting us to do so. It's much appreciated. Thank you, Counsel. Counsel. May it please the Court, Counsel. After reading the defendant's briefs and listening to their arguments today, it's clear that there are just fundamental flaws in their understanding of both the policy of insurance and its terms and the public policy underlying underinsured motorist coverage. It's these misunderstandings that bring us here today. This entire case is simply about how setoffs or reductions to the underinsured motorist coverage benefits under the ERA policy are to be applied. Notwithstanding that being the issue in the case, Counsel, particularly in their briefs and again today, spend much of their time talking about the distinction between a split-limit policy and a single-limit policy. First of all, the two issues here are two points. There's never been a dispute that this is a split-limit policy. It's never been contested by ERI. It's always been acknowledged. Second, it's also clear from the arguments made that the defendants simply don't grasp the significance of a split-limit, of the distinction between a split-limit versus a single-limit policy. More importantly, however, the defendants fail to apply, as the court noted, a clear and unambiguous language of the reduction or setoff provisions of the policy to the facts of this case. Now, as this court's aware, the difference between a split-limit policy and a single-limit policy is simple. A split-limit policy has two separate limits, a per-person limit and a per-accident limit. A single-limit policy, on the other hand, has a single limit, which is simply a per-accident or occurrence limit. Let me stop you, counsel, and ask you a question, just so I have an understanding. In this particular case, if the individual had got a single-limit policy from your company for $300,000 per accident, they would have paid less than having a split limit that gave them no more insurance. Is that correct, or am I looking at this wrong? With all due respect, Your Honor, I believe you're looking at it. I think there are certain things that aren't before the court that would illuminate that issue. First of all, whether or not there was additional premium paid or not paid for this particular coverage is an issue that goes to whether or not there's a latent ambiguity in the policy of insurance. First, defendants never argued that there was a latent ambiguity in the policy of insurance based upon this distinction in payments in the underlying court. Therefore, that argument is waived before this court. Second, that even if they did argue it in the underlying, in the certain court, we would have then had an opportunity to respond and present evidence that, in fact, the $9 difference that we're talking about was charged and then each year refunded to them. We never presented that evidence, and it's not before this court, simply because it was never raised in the underlying court, and we could have shown, had that issue been raised and not waived, that that money was, in fact, returned and there was no ultimate difference in the premiums paid. But additionally, the additional of the $9 in premium simply isn't relevant to the issue before this court because that deals with the limits of protection versus the application of the set-off provision. They're two separate, entirely separate, distinct sections of the policy that we're talking about here. Finally, as this court noted and Oberlin and the Seltzer court noted as well as other courts, the amount that someone pays for the policy doesn't dictate necessarily the amount of coverage. You look to the clear language of the policy, and you look to the underlying public policy for the underinsured motorist coverage. So whether they paid $9 more or $9 less, that doesn't change the fact that the policy language is crystal clear and unambiguous and should be enforced as written. And to the extent they are claiming there's a latent ambiguity, it relates to an entirely different section of the policy, not the set-off or reductions provision. So your company knew then that they were charging people, even if it's $9 more, they were charging them more, and they could have gotten the same coverage for less. Well, I guess the point is that had that issue been raised in the lower court, we would have been able to present the evidence that we have that shows that that money, it was never raised and explored how the premium was determined and so forth, but we can show or we could have shown, had they even raised this issue, that there's this latent ambiguity caused by this $9 payment, that the $9 was in fact refunded to them, that they didn't in the long run pay any more for this coverage. But that was never raised in the lower court, so we never got to address it. And that's the problem with it. So Judge Novak's decision had nothing to do with the premium and what they paid for the premiums at that time. Correct. She was dealing solely with the fact, looking at the language of the coverage, which is clear, and she interpreted that, and she made her decision in keeping with what you believe Oberlin is on point here? I believe with Oberlin, with Seltzer, with the clear language of the policy, with the set-off provisions, even with Hoagland. Hoagland, as counsel tries to say, well, that means something totally different. Hoagland addresses when there are multiple defendants and that it frustrates the purpose of underinsured motorist coverage if there are two defendants, one who has sufficient coverage and one who has either no coverage or insufficient coverage, and that you can't apply the payments from the sufficiently insured defendant as a set-off to the other defendant who has no or insufficient insurance. That's not the case here. We have, as in Oberlin, we have one defendant, Mr. Winant, and he was admittedly underinsured, but that's why they're entitled to recover under the underinsured provision of the policy, subject to the reduction of set-off sections. Now, in our case, as we all know, the limitations with regard to single limit and with regard to the split limits are $300,000 per person and $300,000 per accident. As this Court noted clearly in Oberlin, where the per-person limit is equal to the per-accident limit, the language in the policy subjecting one limit, one coverage, to the other, the subject-to language, has absolutely no meaning and no significance. They've made a big deal about this, but this Court has already ruled that when those two numbers are the same, the subject-to language is meaningless. Notwithstanding this Court's ruling on that, in clear ruling on that in Oberlin, their entire case is based upon the subject-to language, and they rely upon this difference without any distinction to support their argument. On page 18 of their brief, they note that because they purchased a split-limit policy, the policy's reference to limits of protection, which is a different section of the policy, logically and necessarily refers to the per-person limit and not the per-accident limit. They then go on to state that the subject-to language in the split-limit section requires that the state farm payment received by each individual claimant be applied separately against the per-person limit. Well, notwithstanding their assertions, this statement is neither logical, necessary, or even remotely correct. This Court's already ruled that when the two limits are the same, there's no significance to the subject-to language. They're claiming it somehow, even though Oberlin says it doesn't mean anything, that it does. And they're trying to say not only does it mean something, but it means something with regard to another entire section of the policy, the reduction section. And there simply is no such link, support in logic, law, or reason for such a link. Like I said before, this is a case about how to apply the reductions or the set-offs of the amounts paid by Mr. Winan's insurer to the amounts claimed under the under-insured claim. As we note on page 38 of the record, it's in the policy dealing with reductions. The policy provides that the limits of protection, that's limits plural, of protection available under this uninsured, under-insured motorist coverage will be reduced by the amounts paid by or for those liable for bodily injury to anyone we protect. The policy is clear. It's limits plural. This is a split-limit policy. There are two limits. The reduction in payments to anyone we protect is to both limits, both the per-person and per-accident limit. There's no dispute among any of the parties that both Ms. Wagner and Ms. Triana are people that are protected by the ERIE policy. There's no dispute that both received $100,000 for a $200,000 total paid out on their behalf. Applying the clear language of the policy, that $200,000 paid to people that are protected by ERIE reduces both the per-person and per-accident limit of $300,000, leaving $100,000 in under-insured motorist coverage, which is exactly what the circuit court determined. Now, notwithstanding the clear language of the policy, the defendants argued in their opening brief that the term, that because it's a split-limit policy, this means somehow that the word limits, again with an S, plural, really means per-person limit in the reduction section. They want to change that limits to per-person limit. There's no basis whatsoever for doing this. There's none at all. They just won't do it because it achieves the end result that they want. Now, in their reply, they change their argument and they say, Wagner then argues in her reply for the first time that because the word limits, plural, could mean it applies to both the per-person and per-accident limit, it's ambiguous. Nonsense. It's clear. It says limits, plural. There are two limits. It applies to both. There's no question about this. There's no basis of any kind, law, logic, reason, grammar, to think otherwise. Further contradicting their argument is the fact that the policy of the reduction says, we reduce it for anyone, for payments made to anyone we protect. If their reading says, well, you only apply it what one of us gets. If Ms. Wagner only applies the setup of the $100,000 she received to the limits. Well, if that's true, why does it say payments made to anyone we protect? Reading it the way they have this court do renders that clause, payments made to anyone we protect, meaningless, which they acknowledge in their brief, this court cannot do. You have to give meaning to all the sections of the policy. Now, as counsel said and as this court noted, this is an issue that's already been decided by Oberlin and rightly so. It's the exact same issues. This case is squarely on all fours with the Oberlin case. In that case, there were two plaintiffs, Mr. and Mrs. Oberlin, and one defendant, unlike the Hoagland case. The defendant in that case had a $100,000, $300,000 split limit policy, and the Oberlins had a $300,000, $300,000 split limit underinsured motorist policy. That case, Justice Giganti, with both other justices concurring, said it's obvious. You apply the $100,000 Mr. Oberlin got and the $100,000 Mrs. Oberlin got as $200,000. That's a setoff to the $300,000 limit. They're entitled to $100,000 in additional underinsured motorist coverage. Yes, there are other issues addressed in the Oberlin court. They address the anti-stack language and the other insurance provisions. If those are just additional issues regarding whether other policies will apply and the allocation of who pays that $100,000, it does not change the ultimate ruling as to how the setoffs are to be applied. And we're asking this court to follow the reasoning and decision in Oberlin. There's no reason to ignore it. It's properly decided, and it should result in the affirmation of the underlying case, the underlying judgment. Additionally, in addition to rewriting the policy, Wagner and Triana would have this court ignore the fundamental policy underlying underinsured motorist coverage. Ever in this case, Ms. Wagner, Ms. Triana, Erie, this court in its prior decisions, and the Supreme Court in its decisions all agree that the fundamental purpose of underinsured motorist coverage, and I'll quote from Wagner's reply brief, so they can't accuse me of making something up, says the fundamental purpose underlying UIM, or underinsured motorist coverage, is to place the insured in the same position he would have occupied if injured by a motorist who carried liability insurance in the same amount as the policyholder. Now, let's just go through that analysis. To illustrate this point, let's say Mr. Winan, instead of having a 100-300 policy, he had the 300,000-300,000 split limit policy that Ms. Wagner had for her underinsured motorist coverage. In that case, State Farm would have paid $150,000 to Ms. Wagner and $150,000 to Ms. Triana. That's it. That's what they would have received, $150,000 each, which is exactly what this court, what the circuit court decided was proper. That's the amount they're entitled to, $150,000 each, assuming they both had equal injuries. Now, our Supreme Court in Seltzer noted that uninsured and underinsured policies provide virtually the same amount and type of coverage to the insurers. As the court noted at this court question council, what happens if Mr. Winan had no insurance? How much would Ms. Wagner and Ms. Triana have received? If he had nothing, they would get nothing from Mr. Winan. They would make a claim under the Erie's uninsured motorist coverage of $300,000 per person, $300,000 maximum, and they'd each receive $150,000, the exact same amount that Erie's always maintained they're entitled to and that the circuit court found they were entitled to. Now, the Seltzer court further stated that in reviewing the legislative history and the purpose underlying this underinsured motorist coverage, said, we believe that the legislature did not intend to provide that an insured would receive greater benefits under an underinsured than under an uninsured motorist policy. There's no dispute that they get $150,000 each if Mr. Winan is uninsured. Yet somehow, despite Seltzer's, the Supreme Court's clear pronouncement as to that with regard they should be the same, they're claiming they're entitled to $250,000 each. What they're claiming is that they're entitled to $100,000 each from Mr. Winan's coverage, and then they're entitled to another $150,000 each under the Erie underinsured motorist coverage. And that's simply not correct. That's not what Seltzer stands for. That gives them $250,000 each instead of the $150,000 that they bargained for. This is precisely the absurd result that the Seltzer court says should be avoided. Now, this court stated in Oberlin that simply because an insured purchased a policy of insurance, that doesn't create in that insured a reasonable expectation that that insured will receive the full amount of coverage permitted by the policy when there are clear provisions providing for setoffs. They purchased $300,000. That is a limit. That's the most they could ever receive. But they say you have to look at the setoffs. They're not entitled to get more than $300,000. There's no question. But if we apply the setoffs of the $200,000, there's only $100,000 left. Moreover, the Oberlin court stated that public policy does not require this court to invalidate clearly written policy language simply to avoid disappointment in the insured. I'm sure they would like the full $300,000. I'm sure they'd each like $300,000 under the Erie policy. But that's not what the policy provides for. The policy is clear. The limits, again plural, of protection are reduced by payments to anyone protected under the Erie policy. Again, there's no dispute. That's Ms. Wagner and Ms. Triana. They received $100,000 each, $200,000 total. That's the amount of payments received by them that serves as the reduction of the underinsured motorist coverage. The limits are $300,000 reduced by $200,000. They're left with $100,000. Counsel is correct. If Mr. Wagner was in the car and he was injured to the same extent, he would have received $100,000 from State Farm, Mr. Winan's insurer. And there would have been an entire set-off of $300,000 against the underinsured motorist coverage. Because, again, if Mr. Winan was uninsured and all three, Mr. Wagner, Mrs. Wagner, and Ms. Triana, all submitted claims under the uninsured policy, uninsured provision and coverage of the Erie policy, they would each get $100,000 because that's the limit. The absolute limit on the entire policy is $300,000. Counsel would have you believe that they'd each get $300,000 for $900,000 total. That's simply not correct. That stands the limit of protection, the cap, per act of $300,000 on its head and isn't proper. Seltzer and Oberlin specifically address this point and say, that's possible. You could get nothing. If the underlying limits are exhausted, you get nothing. Finally, the circuit court entered judgment granting the motion to dismiss the bad faith claim or Section 155 claim brought by the Wagners against Erie. The Wagners acknowledged in their opening brief that the law in this state is clear, that if there's a bona fide dispute or bona fide defense to a coverage question, the insurance company's conduct can't be deemed to be unreasonable or vexatious. In this case, the position taken by Erie is clearly supported by the Supreme Court's pronouncements in case law, this Court's pronouncements. As the Court noted, it's on all squares with the opening decision. It's clear based upon the policy language. There's no ambiguities in the policy. The policy should be enforced as written. If somehow this Court believes that the policy that wants to rewrite the policy or change the underlying policy governing underinsured motorist coverage, there's certainly a good faith basis for a bona fide defense to the claim that they're entitled to more than the $50,000, the $100,000 remaining coverage in the underinsured motorist coverage. Therefore, the judgment dismissing the claim for unreasonable or vexatious conduct should certainly be affirmed. In conclusion, we'd ask that the judgment entered in favor of Erie finding that there's $100,000 remaining underinsured motorist coverage be affirmed and that the judgment of dismissing the bad faith claim be affirmed. If there's nothing further, thank you very much for your time. I am bothered by an argument that says that with regard to the enhanced premium payment that the record is inadequate or incomplete. The record is absolutely complete because they answered in the rockatories under oath that there was an enhanced premium paid for the split-level policy. Counsel, was the issue of the premiums, was that brought up before Judge Novak? It sure was. And so there was an argument that there was something. It sure was. And where is that again? That would be in the motion for response to the cross-motion for summary judgment and the reply in support of the cross-motion for summary judgment. So it was an issue that she was asked to rule. You bet. All right. We'll see. I also heard counsel acknowledge, as I guess he needed to acknowledge, that if a third person were in the car and was injured substantially, then the coverage that they sold for which they received the premium, based upon language that is not in the policy, in my opinion, there would be no coverage available for anybody under underinsured motorist coverage. That is not what the statute provides for. That is not what the statute contemplates. And that is not a result that could obtain based upon a fair reading using the English language as our standard. Nobody is entitled to receive a double recovery. And at the same time, they are required to honor their unambiguous promise that they will provide coverage of $300,000 per person, not to exceed $300,000 per occurrence. The result here is a result that if one looks in the mirror and contemplates three people injured here, that nothing is recovered, why did we buy the coverage? We got absolutely nothing for our money. To the extent that counsel has suggested to the court that we have not made an ambiguity argument, we have an entire section here in our brief on an ambiguity argument. We devoted an argument to that in the circuit court. We must have cited Hoagland at least four or five times. If your honors will recall, a more careful review of Hoagland will discern that the theory behind Hoagland was that there was a latent ambiguity. And I'm very fond of that case because I was the attorney who represented Hoagland, and I know it almost as well as I know my name, which in my age is a very good accomplishment. The judgment cannot stand because, with all due respect, such a holding is a perversion of what the policy says and the philosophy behind the underinsured motorist coverage. It needs to be reversed, and we need to respectfully have judgment on the cross motion for summary judgment. And once again, thank you for the privilege of oral argument. Thank you, counselors. I take the case under advisement. The court will be in recess.